UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| CHARLES RODGERS | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:21-CV-552 RLM-MGG |
| | ) | |
| WILLIAM HYATTE and | ) | |
| GEORGE PAYNE, JR., | ) | |
| | ) | |
| *Defendants* | ) | |

OPINION AND ORDER

Charles Rodgers has sued Warden William Hyatte and Deputy Warden George Payne, Jr., in their individual capacities, alleging that they subjected him to unconstitutional conditions of confinement while he was imprisoned at Miami Correctional Facility. Mr. Rodgers sued from prison, so the Prison Litigation Reform Act's requirement that he exhaust all administrative remedies before suing over prison conditions applies. *See* 42 U.S.C. § 1997e(a). The defendants have moved for summary judgment, and Mr. Rodgers has cross-moved for summary judgment, on the issue of exhaustion of administrative remedies. Mr. Rodgers requests oral argument to present legal arguments but not additional evidence. Neither party requested a Pavey hearing. *See* Pavey v. Conley, 544 F.3d 739 (7th Cir. 2008).

For reasons explained in this opinion and order, the court DENIES the defendants' motion for summary judgment [Doc. 16], GRANTS Mr. Rodgers's

motion for summary judgment, [Doc. 30], and DENIES AS MOOT Mr. Rodgers's request for oral argument. [Doc. 44]. [1]


LEGAL STANDARD

Federal Rule of Civil Procedure 56 entitles a party to summary judgment when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The court construes all facts and reasonable inferences in the non-moving party's favor. Id. A court considering cross-motions for summary judgment "constru[es] all facts and draw[s] all reasonable inferences in favor of the party against whom the motion under consideration was filed." Hess v. Bd. of Trs. of S. Ill. Univ., 839 F.3d 668, 673 (7th Cir. 2016) (citation omitted). The existence of an alleged factual dispute, by itself, won't defeat a summary judgment motion; "instead the nonmovant must present definite, competent evidence in rebuttal," Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires

---

[1]     Mr. Rodgers's action was consolidated for pretrial, non-dispositive matters with several other cases with similar allegations against the same defendants, [Doc. 15], and he requests consolidated oral argument. [Doc. 44]. The exhaustion defense is a dispositive matter, so the court resolves the issue in separate orders.

trial." <u>Hemsworth v. Quotesmith.com, Inc.</u>, 476 F.3d 487, 490 (7th Cir. 2007); *see also* Fed. R. Civ. P. 56(e)(2).

A defendant isn't entitled to a jury trial on contested issues involving exhaustion. <u>Wagoner v. Lemmon</u>, 778 F.3d 586, 590 (7th Cir. 2015) (discussing <u>Pavey v. Conley</u>, 544 F.3d 739 (7th Cir. 2008)). A court holds a <u>Pavey</u> hearing to resolve issues of fact bearing on exhaustion, but "[w]hen there are no disputed facts regarding exhaustion, only a legal question, the court may resolve the issue without a hearing. <u>Vela v. Ind. Dep't of Corr.</u>, No. 3:16 CV 51, 2017 U.S. Dist. LEXIS 9279, at *2 (N.D. Ind. Jan. 24, 2017).

BACKGROUND

Charles Rodgers alleges that Warden Hyatte and Deputy Warden Payne violated his constitutional rights when they kept him in a restrictive housing unit cell at Miami Correctional Facility, in May, June, and October 2020. He alleges that his cell had broken lights and a window covered with sheet metal, so was extremely dark, and that he was allowed to leave the cell for fifteen to twenty-five minutes every three days to shower. He claims this treatment violated his Eighth Amendment right to be free from cruel and unusual punishment and seeks to hold Warden Hyatte and Deputy Warden Payne accountable by way of 42 U.S.C. § 1983.

Mr. Rodgers sued from prison, so the defendants aren't liable if they can show that Mr. Rodgers didn't exhaust administrative remedies available to him. *See* 42 U.S.C. § 1997e(a).

3

*Miami Correctional Facility's Administrative Remedies*

Miami Correctional Facility follows a grievance process, which, in broad strokes, requires that prisoners file a formal grievance and two appeals to exhaust a claim. The prison followed two written policies covering the time of Mr. Rodgers's complaint: one from April 1 to August 31, 2020, and another starting September 1, 2020. The policies had the same deadlines and procedures for initial grievances and appeals. The parties agree that the second written policy, the Indiana Department of Correction's Offender Grievance Process, Policy and Administrative Procedure 00-02-301, is as follows.

A prisoner can complain about prison conditions by filing a grievance with the prison. The prison considers only certain issues appropriate for the grievance process, like staff treatment, medical or mental health, acts of reprisal, and other concerns about conditions of care and supervision in prison. A prisoner starts by completing a grievance on State Form 45471, to be completed no later than ten business days from the date of the incident giving rise to the complaint. An offender grievance specialist is to review any grievance within five business days of receiving the grievance. A specialist either rejects the grievance or accepts and records it. A grievance specialist can reject a grievance if it is untimely, relates to more than one event or issue, is illegible, and the like. A rejected grievance is returned to the prisoner with State Form 45475, "Return of Grievance." It is not appealable, but a prisoner can submit a revised State Form 45475 within five business days of when the grievance is returned.

4

If a grievance specialist accepts the grievance, the grievance is logged into the prison's computer system and filed with any other grievances filed by that same prisoner. The grievance is marked on the prisoner's log with "I – Formal Grievance." The grievance specialist has fifteen business days to investigate and give a response.

A prisoner who is dissatisfied with the prison's response can appeal the response with State Form 45473. Any appeal is due within five business days of the date of the grievance response. A prisoner can also appeal a grievance if there's no response within twenty business days of when the grievance specialist received the response. An offender grievance specialist is to log the date of receipt of the appeal and forward the appeal to the warden. The warden or his designee is to review the appeal within ten business days of receiving the appeal, and the offender grievance specialist is to give a copy of the appeal response to the prisoner.

A prisoner dissatisfied with the warden's decision can lodge an appeal with the Indiana Department of Correction. The prisoner must check the "disagree" box on the warden or his designee's response and submit the response with the completed State Form 45473 and any supporting documentation. This appeal must be made to the offender grievance specialist within five business days of the warden or his designee's appeal response. A prisoner can also appeal if there's no response within ten business days of when the warden received the first-level appeal. The offender grievance specialist is to document the appeal in the grievance database, logging the prisoner's grievance history with "II – Formal

5

Appeal." An appeal of the warden's decision is reviewed by the Department Offender Grievance Manager and is considered final.

The parties disagree over how this policy was implemented and how Mr. Rodgers used the grievance process.

### Warden Hyatte and Deputy Warden Payne's Account

Warden Hyatte and Deputy Warden Payne assert that Mr. Rodgers didn't exhaust the grievance process. Their evidence includes the Indiana Department of Correction's Offender Grievance Process, Policy and Administrative Procedure 00-02-301, [Doc. 16-2], Mr. Rodgers's grievance history, [Doc. 16-3], copies of Mr. Rodgers's grievances filed during the time of the complaint but unrelated to the complaint, [Doc. 16-4], and a declaration of Michael Gapski, a grievance specialist at Miami Correctional Facility. [Doc. 16-1].

Mr. Gapski reviewed documents that relating to Mr. Rodgers's grievance history and attests to the grievance policy just described. He then attests to Mr. Rodgers's grievances. He says that Mr. Rodgers filed five grievances in the period of the complaint, three of which were arguably related to the complaint's allegations. The first of the three, number 114170, alleged denial of medical care. The second, number 114386, was about a fire near Mr. Rodgers's cell. The third, number 114389, was about a food tray. Mr. Gapski attests that none of the three was appealed.

Mr. Rodgers's grievance history shows that the offender grievance specialists logged each of the three grievances as "I - Formal Grievance" but none as appealed. [Doc. 16-3 at 1].

*Mr. Rodgers's Account*

Mr. Rodgers asserts that he exhausted all administrative remedies available to him. His evidence includes his own declaration, [Doc. 28-7 at 106–108], the deposition transcript of Michael Gapski, the grievance specialist at Miami Correctional Facility who also served as Rule 30(b)(6) representative for the prison, [Doc. 28-1], the deposition transcript of Charlene A. Burkett, the Director of the Indiana Department of Correction Ombudsman Bureau, [Doc. 28-2 to 28-5], and the deposition transcript of Stacy Hall, a correctional officer and law librarian at Miami Correctional Facility, [Doc. 28-6].

According to Mr. Rodgers's declaration, he was twice kept in Miami Correctional Facility's restrictive housing cell with minimal light in 2020. He first was put in restrictive housing in May and was kept there in cell A-440 until the end of June. He submitted two grievances complaining that his cell had no light and that the windows were covered. He submitted the grievances by handing them to a correctional officer. He acknowledges that he filed other grievances about other issues, received responses to those grievances, and didn't appeal them. But he says he never received a response to his grievances about the cell's darkness. Mr. Rodgers says that he didn't know he could appeal a non-response and still doesn't understand how that's possible because to appeal, a prisoner

7

had to know the grievance number and the prison would accept appeals only on certain forms.

Mr. Rodgers says he was placed in restrictive housing again for two weeks in October 2020. His cell lacked light and the window was covered. He filed two more grievances by handing them two correctional officers. He never received responses and couldn't appeal because an appeal required a copy of the response. Mr. Rodgers sent interview request forms to the grievances specialists to ask what happened to his grievances, but never received a response.

Mr. Rodgers presents Mr. Gapski's testimony as evidence that Miami Correctional Facility didn't follow department policy and made the grievance process impossible. Mr. Gapski, a grievance specialist at Miami Correctional Facility, testified as Miami Correctional Facility's Rule 30(b)(6) representative and described how grievance specialists at Miami Correctional Facility handled the grievance process. He explained that in restrictive housing, like Mr. Rodgers's unit, a prisoner wishing to file a grievance would complete a grievance form, hand it to a correctional officer, and the correctional officer would put the grievance in prison intraoffice mail to be delivered to the grievance specialists. No grievance is logged until a grievance specialist receives the grievance, and grievance specialists have no way of knowing whether or when a correctional officer accepted a prisoner's grievance, which correctional officer accepted a grievance, or what happened to a grievance that was sent but never received.

Mr. Gapski also described how Miami Correctional Facility handles appeals. The Indiana Department of Correction policy says a prisoner can appeal

8

the prison's response to a grievance. A prisoner can appeal the prison's response or "may appeal as though the grievance had been denied" if there's no response within twenty business days of the offender grievance specialist's receipt of the grievance. [Doc. 16-2 at 12]. The policy adds that a prisoner who wishes to file a first-level appeal must complete State Form 45473 and submit it within five business days of the date of the grievance response.

Mr. Gapski explained things differently, explaining an extra unofficial step at Miami Correctional Facility. He said that the prison responds to grievances with an Offender Grievance Response Report. That report explains the prison's response and has a spot to mark "agree" or "disagree." It isn't State Form 45473, which the written policy requires for starting an appeal. If a prisoner wants State Form 45473, he marks "disagree" on the Offender Grievance Response Report and sends it to the grievance specialists. When a grievance specialist receives the report marked "disagree," the specialist sends a copy of State Form 45473 to the prisoner. That copy comes from a grievance specialist and must include the original grievance number on it. [Doc. 28-1 at 46–47]. The grievance specialists forward an appeal to the warden and send a receipt to the prisoner only once the specialists have received a completed State Form 45473.

Mr. Gapski also spoke of how timing is calculated. The grievance policy requires that a prisoner "submit a completed State Form 45471, 'Offender Grievance,' no later than ten (10) business days from the date of the incident given rise to the complaint." [Doc. 16-2 at 9]. The same is true for appeals, except that a prisoner has five business days instead of ten. [Doc. 16-2 at 14]. Mr.

Gapski attested that grievance specialists calculate timing based on when they receive an appeal. So an appeal is deemed untimely if not *received* within five business days. Timing doesn't depend on when a prisoner signed an appeal or handed an appeal to a correctional officer, even though prisoners often can't give an appeal directly to a grievance specialist.[2]

Mr. Rodgers also presents deposition testimony of Charlene Burkett, the Director of the Department of Correction Ombudsman Bureau. The Ombudsman Bureau handles prison complaints independently of the Department of Correction and Indiana Department of Administration but doesn't have enforcement power. The Ombudsman Bureau received several complaints from plaintiffs in the consolidated cases, each claiming that Miami Correctional Facility didn't respond to their grievances.

Likewise, Officer Stacy Hall, who was a law librarian in May or June 2021, attested that thirty to forty prisoners complained to her that their grievances didn't receive responses.

## DISCUSSION

Mr. Rodgers and the defendants move for summary judgment on the exhaustion defense. The Prison Litigation Reform Act limits prisoner's ability to sue over prison conditions: "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional

---

[2]   The defendants contend that Mr. Gapski's testimony about timing was only about appeals and not first-level grievances, so Mr. Gapski's testimony can't be used to generalize about how first-level appeals are handled. [Doc. 39 at 11].

facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Act's purpose is to reduce the number and improve the quality of prisoner suits, <u>Woodford v. Ngo</u>, 548 U.S. 81, 94 (2006), and the administrative exhaustion requirement achieves that purpose by "permit[ting] the prison's administrative process to run its course before litigation begins." <u>Cannon v. Washington</u>, 418 F.3d 714, 719 (7th Cir. 2005) (per curiam). Requiring administrative exhaustion might let the prison respond to the grievance in a manner acceptable to the prisoner, avoiding litigation altogether. <u>Dole v. Chandler</u>, 438 F.3d 804, 809 (7th Cir. 2006).

The Act's exhaustion requirement demands strict compliance. <u>Id.</u> "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1025 (7th Cir. 2002). Yet a prisoner need exhaust only "such administrative remedies as are available." 42 U.S.C. § 1997e(a); a prisoner "need not exhaust unavailable ones." <u>Ross v. Blake</u>, 578 U.S. 632, 642 (2016).

Administrative remedies are unavailable despite their availability on paper in three sorts of circumstances. <u>Id.</u> at 643. First, administrative remedies are unavailable when their procedures operate as a dead end, be that because prison officials are unwilling or unable to provide relief. <u>Id.</u> Second, administrative remedies are unavailable when their procedures are so "opaque" and difficult to understand or navigate that they're practically of no use. <u>Id.</u> at 643–644. Third and finally, administrative remedies are unavailable when "prison

administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644.

The PLRA's administrative exhaustion requirement is an affirmative defense belonging to a defendant. Jones v. Bock, 549 U.S. 199, 216 (2007). A defendant invoking the defense must prove that "an administrative remedy was available and that [the plaintiff] failed to pursue it." Thomas v. Reese, 787 F.3d 845, 847 (7th Cir. 2015). Whether a plaintiff exhausted administrative remedies is decided by a judge rather than a jury. Pavey v. Conley, 544 F.3d 739, 741 (7th Cir. 2008).

Warden Hyatte and Deputy Warden Payne's legal argument is straightforward: the prison's policies plainly require two levels of appeal for administrative remedies to be exhausted. Their records don't show that Mr. Rodgers's filed grievances or appeals about the allegations in the complaint, so he must not have exhausted administrative remedies.

Mr. Rodgers's argument is similarly straightforward: the prison didn't respond to grievances and didn't have a process to appeal non-responses, so administrative remedies weren't available.

Approaching from Mr. Rodgers's perspective makes for a clearer picture.

Mr. Rodgers points to his actions and Miami Correctional Facility's inaction and silence to show that he exhausted available remedies. His declaration describes grievances that he sent in June and October 2020. He never received a response to the grievances about his cell's darkness even though he received responses to other grievances. The declaration says Mr. Rodgers

12

requested interviews about his grievances but those requests went unanswered. Mr. Rodgers emphasizes his point with Mr. Gapski's testimony that since January 1, 2020, the prison accepted not a single appeal that a prisoner submitted for a non-response.

According to Mr. Rodgers, this evidence shows that administrative remedies weren't available because the prison didn't respond to his grievances or appeals. He says that prison officials' consistent failure to respond meant that the process wasn't available. *See* <u>Lewis v. Washington</u>, 300 F.3d 829, 833 (7th Cir. 2002).

This argument appears to hit a snag with the grievance policy. A prisoner must follow any prison rules that require administrative appeals, <u>id.</u> (citing <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1025 (2002)), and Miami Correctional Facility's policy required appeals of non-responses. According to policy, a grievance specialists had to respond to a grievance within fifteen business days. If a prisoner didn't receive a response within twenty business days of when the grievance specialists received a grievance, a prisoner was to appeal as if a response had come. The warden was to respond to an appeal within ten business days of receiving the appeal. If he didn't respond by then, a prisoner could appeal as if a response had come. So, Mr. Rodgers would exhaust administrative remedies according to the policy only if he appealed the lack of a response to a grievance and appealed the lack of a response to his appeal.

This appeals process makes little sense. The policy requires that a prisoner who doesn't get a response to a grievance file an appeal, but a prisoner can file

an appeal only by filing State Form 45473. Mr. Gapski describes an unauthorized step requiring a prisoner to first mark another form with "disagree" before receiving State Form 45473. But a prisoner can't mark "disagree" on a form he never receives. This is a dead end.

The defendants insist that Miami Correctional Facility recognizes only the official policy, contrary to what Mr. Gapski says. But even if the prison follows the written policy to a tee, appeals are unavailable for non-responses. The policy tells prisoners to appeal as if the grievance had been denied but doesn't say how a prisoner is to get a copy of State Form 45473,[3] much less how a prisoner in restrictive housing, like Mr. Rodgers was, is to get ahold of State Form 45473.

The same deficiencies apply to the second-level appeal. Policy dictates that a prisoner starts a second-level appeal by marking the warden's first-level response with "disagree." The defendants and the policy don't explain how a prisoner who receives no response to the first-level appeal can mark "disagree" on a form that they don't have and that might not even exist.

Mr. Rodgers argues that between the lack of any response to his grievances about his cell's darkness, the impossibility of appealing a non-response when appealing requires having a copy of the response, and the lack of any response to his requests for interviews, the prison engaged in a game of "gotcha." *See* Shaw

---

[3]     Mr. Rodgers asserts that the only way a prisoner gets State Form 45473 is to receive one from a grievance specialist after completing the unofficial and unauthorized step. The defendants object to this assertion as not supported by Mr. Gapski's testimony — he said that State Form 45473 comes from him but didn't exactly say that there was no other way to get the form. [Doc. 28-1 at 47]. Still, the defendants never explain how a prisoner who doesn't receive a response can get State Form 45473, nor does the written policy address this crucial step.

v. Jahnke, 607 F. Supp. 2d 1005, 1010 (W.D. Wis. 2009) ("The grievance process is not intended to be a game of 'gotcha' or 'a test of the prisoner's fortitude to outsmart the system.'").

If Mr. Rodgers is believed, he has exhausted *available* remedies. Mr. Rodgers could appeal the prison's lack of response after the prison's time to respond lapsed, but that appeal was made impossible because Miami Correctional Facility required State Form 45473 to appeal. It provided State Form 45473 form only after a prisoner completed the unauthorized intermediate step involving the Offender Grievance Response Report. If the defendants are right and they followed the policy word for word, they still don't explain gaps in the policy that don't account for non-responses. Nothing in the written grievance policy tells a prisoner how to appeal if he never receives a response or State Form 45473. Ultimately, the policy's rules about appeals are "based on the assumption that the prisoner has received a response to his original grievance," and doesn't account for non-responses. Knighten v. Mitcheff, No. 1:09-cv-333, 2011 U.S. Dist. LEXIS 2910, at *8–9 (S.D. Ind. Jan. 10, 2011). This policy gap means "there is no adequate appeals process," so Mr. Rodgers "cannot be faulted for failing to appeal." Id. (citing Dole v. Chandler, 438 F.3d 804, 809–810 (7th Cir. 2006)). [4]

---

[4]     Another gap in the policy involves timing. Mr. Rodgers had to appeal a non-response within twenty business days of when grievances specialists received a grievance or ten business days of when the warden received an appeal. Timing didn't depend on when Mr. Rodgers signed or sent a grievance or appeal, and he had no way of knowing when someone else received his grievance or appeal. A prisoner who doesn't receive a response is apparently left to speculate about when an appeal of a non-response is due.

The defendants try to undermine Mr. Rodgers's declaration as insufficient to raise a genuine issue of material fact. They characterize Mr. Rodger's declaration as self-serving and vague, so it is therefore of no use at summary judgment unless unaccompanied by other evidence. [Doc. 38 at 9–10]. (citing Buie v. Quad/Graphics, Inc., 366 F.3d 496, 504 (7th Cir. 2004)). The rule that a self-serving declaration or affidavit alone can't defeat summary judgment has been bad law for a decade in this circuit. Hill v. Tangherlini, 724 F.3d 965, 967–968 (7th Cir. 2013) ("[T]he term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). The court of appeals expressly overruled a litany of its cases "to the extent that they suggest a party may not rely on 'self-serving' evidence to create a material factual dispute." Id. at 967 n.1. The self-serving nature of Mr. Rodgers's declaration isn't reason to discard it.

The defendants argue that Mr. Rodgers's assertions about his grievances are too vague — he doesn't identify the correctional officers who took his grievances, doesn't say who the grievances were directed to, doesn't supply the dates he submitted the grievances, and doesn't explain exactly what the grievances complained about. None of these objections is persuasive. The identity of the correctional officers who took the grievance or appeal isn't material to the factual assertion made — that Mr. Rodgers filed a grievance or appeal. Nor is the timing and content of the grievances too vague. Mr. Rodgers says the first two grievances were about his cell's lack of light and window covering and were filed while he was there in May and June. He's less specific about the second set

of grievances, but the context makes clear that he submitted complaints about the same cell conditions while he was there in October.

After attacking Mr. Rodgers' evidence, the defendants attack his legal arguments.

First, the defendants argue that some relief was available. They cite Mr. Rodgers's grievance log to show that Mr. Rodgers received responses to other grievances, including grievances he sent while in restrictive housing. According to the defendants, this proves that administrative remedies were available because "although the process did not always provide [Mr. Rodgers] with the relief sought, some relief was available, at least for reasonable requests." [Doc. 38 at 6].

That the prison logged some of Mr. Rodgers's other grievances shows that the administrative remedy process worked some of the time for other types of claims. It doesn't show that administrative remedies were available for these grievances. The defendants' argument rests on a misapprehension about the availability of "some relief." They cite Ross v. Blake, 578 U.S. 632, 643 (2016) as saying that if the grievance process can produce "some relief" for one type of claim, then the process is available for other types of claims. But the language in Ross v. Blake isn't so broad. That language comes from Booth v. Churner, 532 U.S. 731 (2001), which held only that a prisoner can't evade the PLRA's exhaustion requirement by seeking a type of relief that's unavailable in the administrative process for that type of claim. Id. at 734 ("The question is whether an inmate seeking only money damages must complete a prison administrative

17

process that could provide *some sort of relief on the complaint stated*, but no money. We hold that he must.") (emphasis added). So if an administrative process would offer some non-monetary remedy for the type of claim in a grievance, a prisoner can't evade the exhaustion requirement by asking for money only. That's a far cry from saying that remedies are available for the type of complaint in a grievance (like one about cell conditions) because some remedy is available for an unrelated type of complaint (like one about food in the cafeteria or books in the law library). The defendants' argument would hold water if Mr. Rodgers claimed that remedies were unavailable solely because the prison was incapable of giving him the relief he demanded. But Mr. Rodgers doesn't argue the remedies were unavailable because the prison was incapable of providing the type of relief he wanted — he contends that administrative remedies were unavailable because he was prevented from filing grievances and appeals.

Second, the defendants argue that the grievance process wasn't onerous. *See* Ross v. Blake, 578 U.S. 632, 643 (2016) ("[A]n administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."). The policy manual requires that prisoners be advised of the grievance policy during admission and orientation. Mr. Gapski attested that admission and orientation includes written information about the grievance process for prisoners. This evidence, the defendants argue, defeats any claim that the prison didn't give Mr. Rodgers information about the grievance process because there's no evidence that the prison didn't follow these procedures. They bolster their argument with Mr. Rodgers's other grievances, particularly those filed while he was in restrictive

housing — if he successfully exhausted administrative remedies, the administrative process mustn't be so opaque as to be unavailable.

This evidence might contradict Mr. Rodgers's statement that didn't know that he was supposed to appeal a non-response. That contradiction doesn't create a genuine dispute over availability of remedies. Mr. Rodgers argues — and supports with evidence — that his own grievances and his requests for interviews went unanswered and that the appeals process for non-responses was impossible in practice. That the prison's policy is to inform incoming prisoners about what the process should be and that other grievances made it through the administrative process, when taken as true, doesn't contradict Mr. Rodgers's evidence that his grievances (and any appeal of a non-response) hit a dead end.

Third, the defendants argue that Mr. Rodgers wasn't hindered from exhausting the administrative process. An administrative remedy isn't available "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross v. Blake, 578 U.S. at 644. They again argue that Mr. Rodgers's declaration is too vague about when he gave grievances to prison guards and who the prison guards were, so he hasn't created a genuine issue that they might not have passed along his grievances. As explained above, the declaration is specific enough to the assertions of material fact — that Mr. Rodgers attempted to filed grievances but they didn't get logged for one reason or another — so this argument doesn't prove exhaustion. Nor does it reflect anything about the availability of non-response appeals.

19

The defendants' reasons to reject Mr. Rodgers's evidence and arguments are unpersuasive, so Mr. Rodgers has created a genuine dispute of fact as to exhaustion. Mr. Rodgers is entitled to judgment on the affirmative defense unless the defendants can somehow prove they're nevertheless entitled to judgment or can show that there's a genuine dispute of material fact requiring a Pavey hearing. *See* Pavey v. Conley, 544 F.3d 739 (7th Cir. 2008).

Warden Hyatte and Deputy Warden Payne argue that they're entitled to summary judgment because their institutional records show that Mr. Rodgers filed grievances about other issues but didn't file any grievances or appeals about his cell conditions. If there are no records of grievances or appeals about his cell conditions, he must not have exhausted administrative remedies.

The defendants rely on Mr. Gapski's declaration. He describes how the grievance policy required a formal grievance and two levels of appeals. He then attests that he reviewed prison records and Mr. Rodgers filed five grievances in the complaint's timeframe, none about his cell conditions. The defendants insist that because the policy required a formal grievance and two levels of appeals and none is recorded, Mr. Rodgers didn't exhaust administrative remedies. They emphasis that court in this circuit must "take[] a strict compliance approach to exhaustion." Dole v. Chandler, 438 F.3d 804, 809 (7th Cir. 2006).

These facts, taken as true, don't create a genuine issue of material fact. They neither account for the gap between when a prisoner tries to send a grievance and a grievance specialist records a grievance nor for the impossible task of appealing a non-response. Mr. Gapski insists that the prison recognizes

only the official policy. The prison can officially recognize one policy while staff follow unauthorized processes, which is what Mr. Gapski testified to. His assertion doesn't controvert that prisoners must complete an Offender Grievance Response Report to get State Form 45473, which is required for appeals. The defendants argue that the lack of a logged grievance or appeal about cell conditions shows non-exhaustion, but this assumes no roadblocks between Mr. Rodgers sending an appeal and the warden or central office receiving the appeal. As explained before, Mr. Gapski's testimony shows: that Mr. Rodgers had to rely on correctional officers to deliver grievances and appeals; that there was no way for Mr. Rodgers or grievance specialists to track a grievance before it got to the grievance specialists; that submitting an appeal required completing the unauthorized Offender Grievance Response Report; and that Mr. Rodgers couldn't appeal non-responses because without a response, he didn't have the required State Form 45473. Even if the warden and central office do respond to all appeals that they receive, the defendants' evidence doesn't create a genuine issue about whether the steps leading up to the warden or central office's receipt of an appeal were available to Mr. Rodgers.

Nor does Mr. Rodgers's grievance history controvert Mr. Rodgers's evidence that administrative remedies were unavailable. That Mr. Rodgers successfully submitted grievances at other times doesn't controvert that these grievances didn't receive a response (whether because of gaps in the policy or individuals' intentional or inadvertent actions) or that Mr. Rodgers couldn't appeal a non-

response. On the contrary, the lack of records could be consistent with his version of events. As Judge Barker, in a similar case, explained:

> Although there is no record of any of these grievances in the prison database, that record is obviously only accurate as to the grievances that are actually inputted into the system by prison officials. In other words, even if a prisoner properly submits a grievance to an appropriate prison official, if the prison grievance specialist does not receive it, either because it is lost or forgotten, or if the grievance specialist fails for some other reason to input the grievance into the system, there would be no record of it having been filed.

Knighten v. Mitcheff, No. 1:09-cv-333, 2011 U.S. Dist. LEXIS 2910, at *6–7 (S.D. Ind. Jan. 10, 2011). The defendants' evidence shows that Mr. Rodgers's grievances about his cell conditions didn't get logged. That's entirely consistent with Mr. Rodgers's evidence and the policy of logging grievances only once they're received.

The defendants suggest that allowing Mr. Rodgers to prove exhaustion with his declaration would undermine the purpose of the Prison Litigation Reform Act by making the exhaustion defense meaningless. They say that "any plaintiff could succeed on a claim alleging they exhausted administrative remedies simply by demonstrating that there is no record of any second or third level appeal grievances submitted." [Doc. 38 at 7].

First, Mr. Rodgers presented other evidence that remedies were unavailable, so he didn't rest merely on the lack of records.

Second and more fundamentally, a prisoner's word might be all that he has. If a prison loses grievances before they're filed, a plaintiff often has only the lack of records and his own word to show exhaustion of remedies. As Judge D'Agostino observed, "it is unclear what evidence Defendants expect Plaintiff to

produce of his grievances that were allegedly discarded by corrections officers." <u>Reid v. Marzano</u>, No. 9:15-CV-761, 2017 U.S. Dist. LEXIS 38547, at *10 (N.D.N.Y. Mar. 17, 2017). Judge D'Agostino noted that a prisoner would ideally keep photocopies for his records, but that doing so was unrealistic because the plaintiff didn't have access to the law library. <u>Id.</u> The same is true for Mr. Rodgers, even if he doesn't specifically allege that correctional officers discarded these grievances; he was in restrictive housing so it's unclear how he could have kept records for himself. In the same vein, the defendants argue that the existence of some grievances shows that the process was available. If proving non-exhaustion were as simple as showing that some other first-level grievances get logged, a prison official could get away with not responding to any appeals so long as the official made sure some fraction of grievances got filed. The logical conclusion to these arguments cut against the defendants; accepting that a prisoner can't rely on the lack of evidence of grievances would incentivize prisons to destroy or lose all grievances and prohibit prisoners from keeping copies of their grievances. A plaintiff would have only his word and the defendants could always reply, "our lack of records and your word aren't enough." The defendants warn against making the defense meaningless, but their position could lead to a perversely impenetrable defense.

Ultimately, the defendants' arguments fall short because they don't reckon with gaps in the policy. These gaps make appealing a non-response impossible, force prisoners to guess about the timing of when certain appeals are due, and allow for grievances to go missing, intentionally or inadvertently, between when

a prisoner tries to file one and a grievance specialist logs one. Insisting that Mr. Rodgers didn't follow the written policy to a tee doesn't prove non-exhaustion when Mr. Rodgers has evidence that policy and practice accounts for each of his claims.

In summary, the defendants' argument that the absence of evidence is the evidence of absence doesn't contradict Mr. Rodgers's evidence that administrative remedies weren't available. The defendants' evidence is consistent with Mr. Rodgers's claims, so doesn't create a genuine issue as to whether administrative remedies were available to Mr. Rodgers. Administrative remedies weren't available to Mr. Rodgers, so he satisfied 42 U.S.C. § 1997e(a) before suing.

A court normally holds a <u>Pavey</u> hearing to resolve factual disputes bearing on administrative exhaustion, but needn't hold a hearing if it can resolve the issue of exhaustion on the documentary evidence. <u>Bessler v. Wexford of Ind. LLC</u>, No. 3:21-CV-691, 2022 U.S. Dist. LEXIS 199409, at *7–8 (N.D. Ind. Nov. 2, 2022). Neither party requested a <u>Pavey</u> hearing and the consistency between Mr. Rodgers's claim of exhaustion and the defendants' evidence means there's no genuine issue of material fact. Accordingly, the court denies the defendants' motion for summary judgment and grants Mr. Rodgers's motion for summary judgment without a <u>Pavey</u> hearing.

Mr. Rodgers requested oral argument to help the court narrow its focus on the voluminous records and briefs across the consolidated cases. Oral argument is unnecessary, so the court denies the request for oral argument.

24

CONCLUSION

For these reasons, the court DENIES the defendants' motion for summary judgment; GRANTS Mr. Rodgers's motion for summary judgment; REJECTS the exhaustion defense; and DENIES AS MOOT Mr. Rodgers's motion for consolidated oral argument.

SO ORDERED.

ENTERED:   August 15, 2023

_____ /s/ Robert L. Miller, Jr.
Judge, United States District Court

25